A. T. STEARNS LUMBER COMPANY *vs.* AUGUSTINE J. HOWLETT & others.

IRVING & CASSON-A. H. DAVENPORT CO. & others *vs.* AUGUSTINE J. HOWLETT & others.

Suffolk.    December 10, 1926. — May 23, 1927.

Present: RUGG, C.J., BRALEY, CROSBY, PIERCE, & SANDERSON, JJ.

*Unlawful Interference. Conspiracy. Monopoly. Labor Union. Strike. Unfair List. Equity Pleading and Practice,* Master: report of evidence excluded subject to exception, exceptions to report. *Evidence,* Relevancy and materiality. *Damages,* In suit in equity, Nominal.

In a suit in equity by manufacturers of trim or finish used in the construction of buildings, each having a usual place of business in Boston and vicinity, against named officers and agents of labor unions, voluntary unincorporated associations, and their members, "who are numerous and most of whom are" to the plaintiffs unknown, to enjoin the defendants from interfering with the "use and sale of the plaintiffs' material by and to such persons as may desire to purchase and use the same," by the institution or threatening of strikes or boycotts and sympathetic strikes "for the purpose of compelling the plaintiffs to refuse to employ operatives who are not members of said defendant unions or to compel them to use the union label, or to do any other act or thing whereby a monopoly in the sale of such merchandise may be created," facts were found and reported by a master, and it was *held,* that

(1) An act lawful in an individual may be the subject of an unlawful civil conspiracy when done in concert, provided it is done with a direct intention to injure another, or when, although done to benefit the conspirators, its natural and necessary consequence is the prejudice of the public or the oppression of individuals;

(2) It was unnecessary for the maintenance of such suits that any overt acts constituting unlawful means be shown; it was enough that the individuals who had combined intended to use unlawful means to accomplish a lawful end;

(3) Whether there was an unlawful purpose creating or tending to create a monopoly was a question of fact;

(4) If the necessary and direct consequence of the acts done or contemplated by the combination would unduly interfere with the free exercise of the rights of those engaged in the manufacture of trim, or of the nonunion workers, it was immaterial that it was not the specific intent of the combination to restrain trade, but that its object was to benefit themselves;

(5) From facts found by the master showing that the union held a controlling position in the labor market and had for one of its objects the employment of union men and the use of union made materials only, and that, considered in connection with the requirements of its constitution and votes of its members which set forth its plans to compel the employers to sign certain agreements containing provisions for the use of the union label and requiring the employers to employ only members of the union and "at any time, to discuss and adjust such grievances or misunderstandings as may occur from time to time that are not provided for in" the agreements, it was probable that the course of action of the union if carried out would create a monopoly within G. L. c. 93, § 2;

(6) It was not necessary to decide what the legal status of such agreements would be if it appeared that as a result of the combination of union men a monopoly existed; the case rested upon a conspiracy to create a monopoly, not upon the existence of a monopoly;

(7) The findings of fact and the inferences that fairly might be drawn therefrom did not support a contention that any of the acts of the defendants had a direct and immediate effect upon interstate commerce, and therefore the plaintiffs were not entitled to relief under the Federal anti-trust law;

(8) While a strike for higher wages, shorter hours or better working conditions is recognized as legal, a strike merely to secure recognition of a union, to force discharge of nonunion men, or to effect a "closed shop" may be found to be illegal;

(9) Voluntary agreements between a union organization and employers, whereby the employer promises to give preference in hiring to union men or to hire only union men or to give all his work to members of a union, have been upheld;

(10) In the absence of an agreement entered into voluntarily by the employer with the union organization, whereby the employer agreed to buy only union made materials, a strike because of his refusal so to do was illegal;

(11) An inference was warranted from findings by the master that the members of the defendant union, having declined to set any nonunion made trim, had agreed to strike on any job, irrespective of whether the contractor had entered into such an agreement as above described, and were ready to carry out their intention;

(12) Agreements between the contractors and the labor union to the effect that the contractors would furnish their employees with union-made material only, even if they were entered into by the contractors voluntarily, could not affect the right of the plaintiffs to the benefit of contracts previously made by them for the furnishing of nonunion made material; and strikes or threats of strikes to enforce such agreements would be unlawful as to the plaintiffs and might be enjoined by their suits in equity;

(13) The placing of the plaintiffs' names on an unfair list and circulating it in the manner described in the record was unlawful;

(14) While it was held that the use of a union label in the way planned by the defendants and under their constitution and rules would have been unlawful, no injunctive relief was necessary because it appeared

that its use had been abandoned, and in the absence of a finding of actual damage the plaintiffs were entitled to nominal damages only on that branch of the suit;

(15) Evidence, offered by the plaintiffs and excluded by the master, to show that there was an existing understanding between the defendants and other building trades in Boston as to calling sympathetic strikes, should have been admitted, since the understanding between the defendants as to sympathetic strikes could be found to have been a part of the unlawful scheme, in which it was alleged the defendants were engaged;

(16) A sympathetic strike generally is held to be illegal;

(17) A strike merely to compel the employment of union foremen is illegal;

(18) A labor union cannot lawfully compel its members to join an unlawful strike by the imposition of fines;

(19) The mere fact, that in the settlement of a strike with the defendants an officer of the union insisted that one of its members who did not strike should be fined and that one of the plaintiffs should pay the fine, even if such conduct was wrongful, was not ground for relief under the frame of the bill;

(20) The plaintiffs severally were entitled to a decree dealing with the following issues: (1) The refusal of the members of the union to install nonunion made material; (2) strikes to compel any employers to refrain from purchasing nonunion made material; (3) the issuing of an unfair list; (4) strikes to compel the hiring of union foremen only; (5) the imposition of fines upon union men who were unwilling to join unlawful strikes; and (6) the combination to induce employers to sign the agreement above described or to agree to purchase union made material only;

(21) The plaintiffs were entitled to nominal damages only by reason of findings by the master that, "if upon the facts as found, the court is of opinion that, as matter of law, a conspiracy did exist, I find, that damage in some amount, which I am unable to determine, was done to the plaintiffs. I find as a fact, however, that whatever damage the plaintiffs may have sustained . . . was that suffered by others in the same line of business as the plaintiffs, and that they suffered no special damage whatsoever."

Testimony as to a telephone conversation, offered at the hearing by the master of the suit above described, to bind the defendants as representatives of the union, properly was excluded because the identity of the person with whom the witness talked was not proved and it did not appear that the witness had called the union headquarters on the telephone.

An exception to a failure by a master, to whom was referred a suit in equity "to hear the parties and their evidence and report his findings to the court together with such facts and questions of law as either party may request," to include in his report findings in support of a certain paragraph in the bill, will not be sustained where it appears that no request for such finding was made before the parties were informed of the contents of the draft report.

Two BILLS IN EQUITY, filed in the Superior Court on June 20 and June 23, 1916, respectively, and afterwards amended, seeking to enjoin the defendants, certain named officers of voluntary, unincorporated labor unions and all members of such unions "who are numerous and most of whom are" to the plaintiffs unknown "(a) from combining and conspiring in any way to prevent the use and sale of the plaintiffs' material by and to such persons as may desire to purchase and use the same; (b) from threatening in any way any person or persons who desire to use these plaintiffs' products that the use of such products will cause them labor troubles or loss of any kind; (c) from inducing, or attempting to induce, in any manner any person or persons, whether the defendants herein or not, to decline employment or not to seek employment with any one because such person may have purchased, or proposes to purchase, materials from these plaintiffs, or because materials furnished by these plaintiffs are being used on or in connection with some building where said persons are doing work, or from any way inducing, or attempting to induce, any person or persons to refuse to install or handle materials manufactured by these plaintiffs; (d) from making or circulating in any way any statement that the defendants or members of any of the unions affiliated in any way therewith will refuse to work upon any materials manufactured by these plaintiffs, and from requesting customers, or those who might become customers of these complainants, not to purchase their products because they do not employ carpenters affiliated with the defendants, or do not use the union label of said United Brotherhood; (e) from notifying in any manner any person to refrain from purchasing merchandise of the plaintiffs or carrying out contracts for such purchase under threats that if such merchandise is purchased or used, the defendants, or some of them, will cause the person so notified loss or trouble in any manner, or from circulating in any manner or in any form a notice that these plaintiffs are on the unfair list, or are not on the list of persons with whom only these defendants will deal; (f) from combining and conspiring in any way to restrain or destroy the business of these complainants in the sale of

goods and from doing any acts in furtherance of said combination to discourage the sale or disposition of the products of these plaintiffs, or the handling thereof, for the purpose of compelling the plaintiffs to refuse to employ operatives who are not members of said defendant unions or to compel them to use the union label, or to do any other act or thing whereby a monopoly in the sale of such merchandise may be created."

The suits were referred to a master to be heard together, the interlocutory decree directing "that the evidence offered in either case be considered as offered in both so far as applicable to both." Material facts found by the master are stated in the opinion. The agreement "A", referred to in the opinion as one which the defendants sought to compel the plaintiffs to sign, was in its blank form as follows:

"CARPENTERS' DISTRICT COUNCIL OF BOSTON AND VICINITY

AGREEMENT

made and entered in this.................................
by and between THE CARPENTERS' DISTRICT COUNCIL OF BOSTON AND VICINITY OF THE UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, and Association of employees, party of the first part, and...................
manufacturers of trim and shop-made carpenter work, hotel, bank, bar, store and office fixtures, and of church, school and household furniture, and dressed lumber, party of the second part, agree jointly and individually, upon the following expressed terms and conditions for harmonious business as pertaining to the buying and selling of labor, for the prevention of industrial strife, and for the settlement of all controversies, fairly and equitably, as they arise, when the same are not governed by the terms and provisions following:

"The party of the first part, by its District Council, agrees to furnish to the party of the second part the use of its Union Label and Stamp, without cost, other than the compliance with the following conditions:

"First. — All the employees of the party of the second part employed in the manufacture of trim and shop-made

carpenter work, hotel, bank, bar, store and office fixtures, and of church, school and household furniture, and dressed lumber, must be members of the United Brotherhood of Carpenters and Joiners of America at the going into effect of this agreement.

"Second. — That the party of the second part further agrees that he will employ none but members of the aforesaid organization, and if none such are procurable, will only employ such workmen that signify their willingness to join the said United Brotherhood of Carpenters and Joiners of America.

"Third. — The party of the second part agrees to abide by all laws of the aforesaid organization and working rules of the District Council party of the first part appertaining to the employment of apprentices, and the requirements exacted of applicants for membership, and of employers regarding the use of the Union Stamp and Label.

"Fourth. — The party of the second part further agrees to meet a duly authorized committee from the said United Brotherhood, at any time, to discuss and adjust such grievances or misunderstandings as may occur from time to time that are not provided for in this agreement.

"In consideration of the compliance with the above terms and conditions on the part of the party of the second part, the party of the first part agrees to place its Union Stamp or Label on all products manufactured by the party of the second part and agrees to furnish the party of the second part an official Stamp and Labels.

"The party of the first part further agrees to promote the interests of the party of the second part insofar as advertising and recommending the business of the party of the second part to all its friends and constituents as deserving of their patronage, and it shall be the duty of all members and the Local Unions and the District Council to promote the use of trim and shop-made carpenter work, hotel, bank, bar, store and office fixtures, and of church, school and household furniture bearing the said Label, by patronizing such firms as are displaying the same, and wherever possible to prevent the members under their jurisdiction from encouraging the

use of any Non-Union material by handling the same, as a result of their compliance with the terms and conditions set forth in this agreement.

"This agreement entered into by and between the party of the first part, an association of employees, and the party of the second part, a manufacturer of trim and shop-made carpenter work, hotel, bank, bar, store and office fixtures, and of church, school and household furniture, and dressed lumber, shall remain in full force and continuance until violated.

"The violation of this agreement on the part of the party of the second part shall be cause for the revocation of all the privileges granted by the provisions required of the party of the first part as contained herein.

"It is agreed that should the party of the second part sell, dispose of, or convey their business, this agreement shall become null and void.

"(Party of the first part)          (Party of the second part)
Carpenters' District Council
of Boston and Vicinity of the          . . . . . . . . . . . . . . . . . . . .
U. B. of C. and J. of A.

By . . . . . . . . . . . . .Sec'y C.D.C. . . . . . . . . . . . . . . . . . . . . . . . . . .

The suits were heard by *McLaughlin*, J., upon a motion to recommit the report to a master and exceptions by both parties to the report; and interlocutory decrees were entered denying the motion, overruling the exceptions, and confirming the report. The plaintiffs appealed. Thereafter the suits came on to be heard by *Bishop*, J., who reported them to this court for determination.

*E. A. Whitman,* for the plaintiffs.

*L. A. Mayberry,* (*R. Gallagher & W. F. Levis* with him,) for the defendants.

BRALEY, J.  In these suits the plaintiffs — all manufacturers of trim or finish used in the construction of buildings, each having a usual place of business in Boston and vicinity — ask injunctive relief against an alleged illegal combination and conspiracy of the defendants — all named and unnamed members of the United Brotherhood of Carpenters

and Joiners of America, hereinafter called the Brotherhood —
to injure their business and to recover consequential damages.
The cases were heard by a master and his reports were con-
firmed by the trial judge who, on February 16, 1926, re-
ported them to this court for determination upon " . . . the
bill, the substitute answer, the order of reference to . . .
[the] master, the master's report, the objections and ex-
ceptions thereto, the decree overruling them and confirming
the master's report, the plaintiffs' motion to recommit. . . .
the order denying the motion to recommit and the appeal
therefrom," the order of the court that these cases be heard
together, "the demurrer of the defendants . . . the decree
overruling the same and the appeal therefrom, the bill of
complaint having been dismissed as to certain plaintiffs,
. . . on their request and the case having proceeded to trial
by stipulation against union defendants only and not against
other defendants, demurrer of defendants . . . filed De-
cember 29, 1916, to amended bill, demurrer of defendants
. . . filed January 2, 1917, orders overruling both demurrers
and appeals therefrom by defendants, such decree to be
entered, or order to be made, as justice may require."

In the case of Irving & Casson-A. H. Davenport Company
et als, hereinafter called the Casson Company, of the plain-
tiffs named in the bill only the following are conducting this
suit: Davenport-Brown Company, Carder Woodworking
Company, M. Frank Lucas, Burnham Brothers, Benjamin
Pearson, W. C. Miles Company and Thomas Uniacke.

In so far as the questions raised by the plaintiffs are com-
mon to both cases, a single discussion of the governing prin-
ciples of law will be sufficient.

A substantial summary of the pertinent facts found by the
master is as follows: The A. T. Stearns Lumber Company,
hereinafter called the Stearns Company, operated a so called
open shop. The W. C. Miles Company and Thomas Uniacke
were, at the time the bill was filed, making no discrimination
in their employment of union and nonunion men and, in
consequence of this attitude, no union men were employed
by them on June 1, 1916. The remaining plaintiffs operated

so called union shops.   Only three of these plaintiffs employed union foremen.

The master found that the aim of the United Brotherhood was to get men employed in the various mills to join the union and, in order to accomplish this, sought to compel the plaintiffs to sign an agreement, the result of which would be to unionize all shops and mills and, in consequence, none but members of the United Brotherhood would be employed either in the mills or on the work of construction and the union label would be used; that the "paramount, controlling and immediate object and purpose of the defendants was to benefit themselves and better their conditions by securing a larger field of employment, higher wages, and in consequence, a better living, and not to destroy or injure the business of the plaintiff or to create a monopoly"; that "votes were passed by the Carpenters' District Council of Boston and Vicinity in August, 1915, and January 6, 1916, making certain changes in their trade rules, as to working hours, wages and the handling of trim not made under what they termed union conditions to take effect after June 1, 1916. That, for the purpose of giving notice thereof, the defendant Toomey sent out about March 11, 1916, some two thousand circular letters in and around Boston and vicinity, stating the purpose of said vote to carpenters, contractors and builders, architects and others, enclosing a copy of the trade rules," as follows: "Enclosed you will please find a copy of the Trade Rules issued by the Carpenters' District Council of Boston and Vicinity.   I desire to call your attention to the changes therein, particularly the working hours and wages, which will take place on June 1st, 1916 for outside Carpenters, also Shop and Millmen.   Also to notify you that on and after the same date members will handle only trim that bears the label of the United Brotherhood of Carpenters and Joiners of America.   Any further information you may desire can be obtained from the Secretary."   After the circulation of this letter the plaintiffs suffered a loss of business.

The master further found that from about the first of January to April, 1916, oral agreements were made between the local unions, in and about Boston, and certain builders —

among whom were McKenzie and Temple, W. F. Kearns Company, J. J. Prindiville Company, David R. Donaldson, J. F. Carroll Construction Company, Old Colony Realty Company, McGahey and O'Connor and Peter C. Baker — "to operate union jobs, hire union carpenters, pay union wages, adopt union hours and furnish their carpenters with union material to work upon"; that in pursuance of the vote "to change working hours, increase wages, to employ union foremen and to refuse to set trim made in any shop or mill by men not members of the United Brotherhood," the carpenters who were members of the United Brotherhood declined to set trim so made, which included the shop of the Stearns Company; that none of the contractors attempted to secure nonunion carpenters on the jobs complained of, but preferred to accede to the requirements of the defendants that they employ union carpenters and thus avoid having the union carpenters quit work.

Section 59 of the constitution of the United Brotherhood provides, in part, that "it is necessary to all mill and shop members and the United Brotherhood that products made in factories, shops or mills where only members of the United Brotherhood are employed should be installed by fellow members." This section, among others, was known in substance to the plaintiffs and builders before they received notice of these rules on March 11, 1916; that "all manufacturers of woodwork who operated under an agreement with the said Brotherhood or any of its branches or subdivisions and agreed to employ its members exclusively are said to be unionized and are known by the defendants as union or fair manufacturers and their products are known as union or fair products"; that "all manufacturers who do not operate under such an agreement are known by the defendants as nonunion or unfair, and their products are known as nonunion or unfair material."

As bearing upon the alleged conspiracy to create a monopoly, the master found that "if all the mills had signed the agreement referred to and thus become unionized, the union carpenters would have all the work of making building finish or trim in the existing mills where it is made, and so

far as I can find as a fact, I do find that this would be a monopoly. If, however, this is a matter of law, I report the facts and leave it to the court to rule as a matter of law whether this fact and the other facts which I find would constitute a monopoly of the business of manufacturing and selling shop finish, either at common law or under the statutes of the United States or under the statutes of this Commonwealth"; that if the defendants had succeeded in causing all shops or mills to be unionized except those of the plaintiffs, "the business of the plaintiffs would have been impaired and that it would be of little or no value"; that the building trade in and about Boston has varied in different years as to the extent of being unionized; that during the period affected by the war it was less unionized than at other times; that in general it is unionized and in a few instances only has it been possible to erect large buildings unless union men have been employed exclusively; that although by far the greater amount of construction work of all kinds is done by union men as union jobs, yet there is a large amount of construction work done by nonunion men as nonunion jobs, and that there is a substantial number of nonunion carpenters available "if a contractor desires to employ them, usually with attendant trouble." It appears from the report that there were in Boston and vicinity, at this time, approximately five thousand, two hundred and sixty-three union carpenters and six hundred nonunion carpenters.

It is further found that "Some architects and contractors refused to deal with the plaintiffs fearing that if they did so there would be trouble with the unions on the jobs where finish from the plaintiffs' mills was used. That all the plaintiffs suffered a substantial loss of business after June 1, 1916, but this loss was not shown to be due to the defendant, only in part, and in what part I am unable to find. All of these plaintiffs sell their product not only in Massachusetts but in other states of the Union."

The master found that "The plaintiff Carder Woodwork Company has a mill in Boston. Its annual sales before June 1, 1916, were over $70,000 a year. The defendants Howlett,

Feeley and Toomey called on the treasurer before June 1, 1916, and asked what he was going to do on the first of June, adding 'of course you understand that you cannot run your business unless we say so,' Howlett remarking, 'I hold my hand on the heads of one hundred and fifty thousand men.' They also said that they could stop all outside finish coming into Boston. That this company refused to sign the agreement and as a result their men who were members of the union attempted to start work as stated by the union, that the company stated to the men that they could not start at that time but must come earlier, and as a result the men left"; that the plaintiff, Burnham Brothers, operate a mill in Newton with an investment of $45,000; that shortly before June 1, 1916, "the defendants Howlett, Thulin and Johnson, called on them and demanded that they adopt the union label, and if they continued to run forty-eight hours a week they could not send their product into Boston and Brookline, as the carpenters would refuse to put it up."

"It is elemental that the unlawfulness of a conspiracy may be found either in the end sought or the means to be used." *Martell* v. *White*, 185 Mass. 255, 257. *Commonwealth* v. *Hunt*, 4 Met. 111, 123. It is settled that "An act lawful in an individual may be the subject of civil conspiracy ·when done in concert, provided it is done with a direct intention to injure another, or when, although done to benefit the conspirators, its natural and necessary consequence is the prejudice of the public or the oppression of individuals." *Cornellier* v. *Haverhill Shoe Manufacturers' Association*, 221 Mass. 554, 561. *Haverhill Strand Theatre, Inc.* v. *Gillen*, 229 Mass. 413, 421. *Mechanics Foundry & Machine Co.* v. *Lynch*, 236 Mass. 504, 506. The motive of the conspirators is immaterial. See *Baush Machine Tool Co.* v. *Hill*, 231 Mass. 30, 39. The English cases — *Sorrell* v. *Smith*, [1924] 1 Ch. 506, *Ware & De Freville, Ltd.* v. *Motor Trade Association*, [1921] 3 K. B. 40, and *Davies* v. *Thomas*, [1920] 1 Ch. 217 — cited by the defendants, require actual intention on the part of the defendants to injure the plaintiffs. In so far as these cases differ from our own decisions·

we decline to follow them.   It is unnecessary for the maintenance of these suits that any overt acts constituting unlawful means be shown; it is enough that the individuals who have combined intend to use unlawful means to accomplish a lawful end.   *Haverhill Strand Theatre, Inc.* v. *Gillen, supra.   Commonwealth* v. *Dyer,* 243 Mass. 472, 483, 484. *Hogan* v. *O'Neill,* 255 U. S. 52, 55.

In *Commonwealth* v. *Dyer, supra,* page 486, it was said by this court that "The earlier conception of a monopoly was a grant of an exclusive right from the sovereign power. . . . In the modern and wider sense monopoly denotes a combination, organization or entity so extensive and unified that its tendency is to suppress competition . . . to the public harm. . . . It was said by Chief Justice White in *Standard Oil Co. of New Jersey* v. *United States,* 221 U. S. 51, 54, . . . ' That by the common law monopolies were unlawful because of their restriction upon individual freedom of contract and their injury to the public.' Without analysis of the authorities outside this Commonwealth we accept this as a complete summary of the law."   It is stated in *Keith* v. *Heywood Boot & Shoe Co.* 255 Mass. 321, 324, that "The facts material to the case should be found to aid the court in determining whether the agreement and lease are in violation of the provisions of G. L. c. 93, § 2, which forbids those agreements, arrangements and combinations that violate the common law in three stated respects: 'first, that they create, establish or maintain a monopoly in the manufacture, production or sale in this Commonwealth of any article or commodity in common use; secondly, that thereby competition in the Commonwealth in the supply or price of any such article or commodity is or may be restrained or prevented; thirdly, that for the purpose of creating, establishing or maintaining a monopoly, such as has been stated, the free pursuit in the Commonwealth of any lawful business, trade or occupation is or may be restrained or prevented.'"   The restraint imposed must be unreasonable.   *Quincy Oil Co.* v. *Sylvester,* 238 Mass. 95, 97.   *Sherman* v. *Pfefferkorn,* 241 Mass. 468, 474.   *Chicago Board of*

*Trade* v. *United States*, 246 U. S. 231, 238. *Window Glass Manufacturers* v. *United States*, 263 U. S. 403, 413.

It is manifest that the numerical size of a union or its preponderant position in the labor market does not of itself make it illegal. *Goyette* v. *C. V. Watson Co.* 245 Mass. 577, 593. "The pertinent inquiry, whether there is an unlawful purpose creating or tending to create a monopoly depends on the circumstances of each case. The facts peculiar to the business, the conditions before and after the alleged restraint was imposed, its nature, and the purpose sought to be attained, as well as prevalent economic necessities, are to be considered as relevant. It is primarily a question of fact." *Berenson* v. *H. G. Vogel Co.* 253 Mass. 185, 187, 188, and cases there cited.

The plaintiffs have alleged, in substance, that the combination should be declared illegal as tending to create a monopoly of the labor market and of materials used. None of the various employers who signed agreement "A", the substance of which appears in the master's report, are joined as defendants in the Stearns case, but in the Casson case some of them are so joined. "Where acts are not sufficient in themselves to produce a result which the law seeks to prevent, — for instance, the monopoly — but require further acts in addition to the mere forces of nature to bring that result to pass, an intent to bring it to pass is necessary in order to produce a dangerous probability that it will happen. *Commonwealth* v. *Peaslee*, 177 Mass. 267, 272. But when that intent and the consequent dangerous probability exist, this statute [the Sherman Act], like many others and like the common law in some cases, directs itself against dangerous probability as well as against the completed result." *Swift & Co.* v. *United States*, 196 U. S. 375, 396. *United States* v. *United States Steel Corp.* 251 U. S. 417, 445. If the necessary and direct consequence of the acts done or contemplated by the combination would unduly interfere with the free exercise of the rights of those engaged in the manufacture of trim, or of the nonunion workers, it is immaterial that it was not the specific intent of the combination to restrain trade, but that its object was to benefit

themselves. *United States* v. *Patten,* 226 U. S. 525, 543. *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443, 461, 468. *Anderson* v. *Shipowners Association,* 272 U. S. 359.

It is settled that in considering facts found by the master, this court, on appeal, may draw its own inferences therefrom. *Caines* v. *Sawyer,* 248 Mass. 368, 372. "The right to conduct a lawful business is a property right, protected by the common law and guaranteed by the organic law of the State." *Godin* v. *Niebuhr,* 236 Mass. 350, 351. It is likewise true that if employees are deprived of access to the employing market, they are deprived of a property right. *Shinsky* v. *Tracey,* 226 Mass. 21, 24.

In the cases at bar certain representatives of a national union and of its subdivisions are named as defendants. The facts as found by the master tend to show that the union holds a controlling position in the labor market and has for one of its objects the employment of union men and the use of union made materials only; that it is probable that this course of action of the union if carried out would create a monopoly within the meaning of G. L. c. 93, § 2, involving, as it does, inducing the employers to sign agreements similar to agreement "A" considered in connection with the requirements of its constitution and votes of its members which set forth its plans to compel the employers to sign such agreements. See *Martell* v. *White, supra; Berry* v. *Donovan,* 188 Mass. 353, 359; *Merchants Legal Stamp Co.* v. *Murphy,* 220 Mass. 281; *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.* 220 U. S. 373, 408; *Eastern States Retail Lumber Dealers' Association* v. *United States,* 234 U. S. 600; *Loewe* v. *Lawlor,* 208 U. S. 274; *Lawlor* v. *Loewe,* 235 U. S. 522, 534; *Thomas* v. *Cincinnati, New Orleans & Texas Pacific Railway,* 62 Fed. Rep. 803; *Paine Lumber Co. Ltd.* v. *Neal,* 244 U. S. 459, 471; *United States* v. *Brims,* 272 U. S. 549. *Bedford Cut Stone Co.* v. *Journeymen Stone Cutters' Association,* 274 U. S. 37. It is not necessary to decide what the legal status of such agreements would be if it appeared that as a result of the combination of union men a monopoly existed. The cases rest upon a conspiracy to create a monopoly, not upon the existence of a monopoly.

It is argued by the plaintiffs that these suits present a
question under the Federal Anti-Trust Law, 26 U. S. Stat.
at Large, 209, c. 647, and, if so, the findings of fact must be
considered in the light of this law. The plaintiffs allege
that they are engaged in business in Massachusetts and
elsewhere in the United States and as a result of the acts of
the defendants their business is "faced with ruin." It is
not entirely clear that any direct interference with interstate
commerce is properly set forth within the rule "that the
stating part of the bill . . . must be distinctly and expressly
averred, and not in a loose and indeterminate manner, to be
explained by inference, or by reference to other parts of the
bill." *Stevens* v. *Hayden*, 129 Mass. 328. *Clark* v. *Lee*,
185 Mass. 223. *Bartlett* v. *New York, New Haven & Hart-
ford Railroad*, 221 Mass. 530, 539. Even if it be assumed
that a direct interference with interstate commerce is prop-
erly pleaded, the findings of fact and the inferences that
fairly may be drawn therefrom do not support the conten-
tion that any of the acts of the defendants have a direct
and immediate effect upon interstate commerce, and there-
fore the plaintiffs are not entitled to relief under the Federal
anti-trust law. *United Shoe Machinery Co.* v. *La Chapelle*,
212 Mass. 467, 484, and cases cited. *United Mine Workers
of America* v. *Coronado Coal Co.* 259 U. S. 344, 407. *Leather
Workers International Union* v. *Herkert & Meisel Trunk Co.*
265 U. S. 457, 464, 465. *Anderson* v. *Shipowners Association,*
*supra.*

Before discussing the various means used or contem-
plated by the union organization to compel the plaintiffs
to sign an agreement similar to agreement "A", it may be
well to refer to some of the decisions of the court in related
matters. The strike for higher wages, shorter hours, or
better working conditions is recognized as legal. *Cornellier*
v. *Haverhill Shoe Manufacturers' Association, supra,* page 562.
We have, however, held a strike to enforce the employment
of a larger number of men than the employer desired illegal.
*Haverhill Strand Theatre, Inc.* v. *Gillen, supra.* Strikes to
secure recognition of the union, to force discharge of non-
union men, or to effect a closed shop have been held illegal.

*Plant* v. *Woods,* 176 Mass. 492.   *Berry* v. *Donovan, supra.*
*Folsom* v. *Lewis,* 208 Mass. 336.   *W. A. Snow Iron Works,*
*Inc.* v. *Chadwick,* 227 Mass. 382, 388, 389.   *Baush Machine*
*Tool Co.* v. *Hill, supra.   Folsom Engraving Co.* v. *McNeil,*
235 Mass. 269, 276, 277.   *Moore Drop Forging Co.* v.
*McCarthy,* 243 Mass. 554.   *White* v. *Riley,* [1921] 1 Ch. 1,
*Hodges* v. *Webb,* [1920] 2 Ch. 70, and *Wolstenholme* v. *Ariss,*
[1920] 2 Ch. 403, cited by the defendants, were decided
under 6 Edw. VII, c. 47, §§ 1, 3, and § 5, subsection 3, which
permits such action on the part of union labor organizations.
But voluntary agreements between the union organization
and employers whereby the employer promises to give
preference in hiring to union men, *Hoban* v. *Dempsey,* 217
Mass. 166, or to hire only union men, *Ryan* v. *Hayes,* 243
Mass. 168, or to give all his work to members of the union,
*Shinsky* v. *O'Neil,* 232 Mass. 99, 102, see *Pickett* v. *Walsh,*
192 Mass. 572, have been upheld.   A strike to force the
discharge of an employee's helper, on the ground that there
was not enough work to go around, was held legal.   *Minasian*
v. *Osborne,* 210 Mass. 250.   In *Mechanics Foundry & Ma-*
*chine Co.* v. *Lynch, supra,* the defendants quit work because
one of their fellow workmen was discharged.   It was ad-
mitted that the defendants had done nothing else that could
be questioned.   An injunction was granted restraining the
defendants from continuing the strike.   A strike because of
an employer's failing to keep an engagement to discuss a
closed shop agreement has been held legal.   *Walton Lunch*
*Co.* v. *Kearney,* 236 Mass. 310.

In his report the master set out in detail eight different
jobs, all of which were under construction in the spring
and summer of 1916, where trouble arose between repre-
sentatives of the Brotherhood and the contractors and
builders named in his report as having made an oral agree-
ment with it to run a union job and use union made mate-
rials, by reason of the fact that, in each instance, union men
were called upon to erect finish or trim manufactured by the
Stearns Company, against which there was "no personal
feeling or animosity . . . at any of the times referred to";
no objection made to the fact that the plaintiff made it

other than it was a nonunion shop; and other than as above stated there was no threat and nothing said as to calling a strike of other trades. No useful purpose can be accomplished by repeating them in full; we therefore summarize them as follows:

W. F. Kearns Company was erecting a large office building in Boston. On June 14, 1915, the Kearns Company was notified by the union that "no finish would be erected by union men . . . unless the same was procured from mills . . . employing none but members of the above union organization"; that the union had been informed of its contract for finish with the Stearns Company and suggested "that you take the matter up with them and try and arrange to have the matter rectified so that no trouble will take place on the work." After the receipt of this letter, the Kearns Company wrote the plaintiff cancelling the contract, stating therein: "You will readily see that we cannot go ahead with anything that we know is going to cause trouble and delay . . . but, under the present conditions and circumstances, we feel that there is nothing for us to do but to take the work out of your hands."

J. J. Prindiville Company had under construction large buildings in Boston. While the work was in progress, representatives of the Brotherhood called upon the contractor, made inquiries as to who was to furnish the finish, and, upon being told it was the Stearns Company, one of them asked if he knew that company was nonunion; upon being told by the contractor that he did not know it, said that "he would have trouble in using the finish; that . . . they would not put it up when they found it came from" the Stearns Company. The contractor insisted, saying: "he had found out from Stearns where they were furnishing it in other places; that, if they put it up for others, they were going to put it up for him," and the defendants departed. Later the contractor called the union representative to the job for the purpose of adjusting the matter, and, finally, was told "they would finish the down stairs, which they did, and also the union carpenters finished the rest of the job." The representative of the union stated that this

was done because "it had been ordered and that Prindiville did not know of the circumstances, but to look out for the next job." After the completion of these jobs the Prindiville Company "has had no further stock from the plaintiffs, nor asked them for bids." The master further found that the "Prindiville Company preferred to employ union carpenters because, on the average, they were better men, more skilful and better workers than the nonunion men."

J. F. Carroll Construction Company had houses under construction in Boston. After the trim in two houses had been erected, defendant Howlett visited the work, talked with the men, and soon after they left the job. Thereafter Carroll, of the company, went to union headquarters and was told by defendants "Our carpenters will not be allowed to go ahead unless we have finish furnished from union mills." Upon representations of Carroll that if he was not allowed to continue it would be a big loss to them, "they agreed that he might finish five houses," and he cancelled his contract with the Stearns Company for the other five, and procured finish elsewhere.

McKenzie and Temple had houses under construction in West Roxbury and Hyde Park. Defendant Howlett talked with Temple in June and told him that "the union men would not put up finish which came from a nonunion shop, and also that the finish had no union label." When the contractor protested against cancelling the order for finish, he was told that "he should have done it when he received the notice of March 11, 1916." Soon after this work stopped, was resumed, stopped again, but was "ultimately finished by union men and the trim in question was installed." On another job under construction at the same time and under similar circumstances, Howlett told Temple that "if the order for interior finish was cancelled, he would allow the men to put up exterior finish"; this job was finally finished by union men and the trim in question was installed and the contract not cancelled.

The Old Colony Realty Associates were erecting four houses under the direction of John V. Peard, architect, in Brookline. After the first house was erected, union repre-

sentatives talked with the men who thereafter refused to set the finish and the architect cancelled the order for trim with the Stearns Company on this account. On another job under construction by this contractor, the foreman was told by a representative of the Brotherhood "not to use the Stearns finish, because he would get into trouble."

Peter C. Baker was erecting a building in Weston during the construction of which defendant Johnson had been on the job frequently and talked with the men. After the principal work was completed "the carpenters . . . refused to use the material as it was from the shop of A. T. Stearns, a nonunion mill."

David R. Donaldson was erecting a house in West Newton. In conversation with the Stearns Company as to the purchase of material from it, he said "that he did not want any trouble with the union as he had always run a union gang and was a union man," and on July 17, 1916, wrote a letter to the Stearns Company in part as follows: "With the understanding that all trouble is passed between you and the labor union about using your stock, I confirm our telephone conversation that you are the low bidder on the two houses . . . for all inside and outside finish." Certain finish had been furnished by the Stearns Company and used on this job. Thereafter defendant Johnson visited the job, talked with the foreman and "objected to having the inside finish put up by union men but did not object to the outside finish." This conversation was reported to the builder, after which he had a talk with a representative of the Stearns Company and "the trim was furnished and erected and no strike occurred."

McGahey and O'Connor were erecting a building in Roxbury. While the construction work was going on a business agent of one of the defendants visited the job and found shingles from the Stearns Company mill which had been marked with their name and the mark removed. The shingles were put on by union carpenters.

The master further summarized the attitude of the defendants in the foregoing eight instances as follows: "I find . . . that in each instance when nonunion trim was offered and in

consequence of which the union carpenters left the jobs, no interference, threat or intimidation, violence, compulsion or coercion except as heretofore found were made by the union or any of its members, with or to the plaintiffs, or with the conduct of the jobs, or the employers, or as to the purchase of material or with any customer or prospective customer other than the quitting of union carpenters on the job and the fear of trouble which might follow, which fear was a reasonable one. . . . the defendants did nothing to prevent the contractors employing nonunion carpenters to install this trim, or finish."

It is plain that, in the absence of an agreement entered into voluntarily by the employer with the union organization, whereby the employer agrees to buy only union made materials, a strike because of his refusal so to do is illegal. *Burnham* v. *Dowd*, 217 Mass. 351. *New England Cement Gun Co.* v. *McGivern*, 218 Mass. 198, 203. *Harvey* v. *Chapman*, 226 Mass. 191, 195. *Godin* v. *Niebuhr, supra*, page 351. *Anderson & Lind Manuf. Co.* v. *The Carpenters' District Council*, 308 Ill. 488. *Purvis* v. *Local No. 500 United Brotherhood of Carpenters & Joiners*, 214 Penn. St. 348. *Booth* v. *Burgess*, 2 Buch. 181. *Lohse Patent Door Co.* v. *Fuelle*, 215 Mo. 421. *Shine* v. *Fox Bros. Mfg. Co.* 156 Fed. Rep. 357. *My Maryland Lodge* v. *Adt*, 100 Md. 238. See *Duplex Printing Press Co.* v. *Deering, supra*, page 461. Compare *Bossert* v. *Dhuy*, 221 N. Y. 342, as limited by *Auburn Draying Co.* v. *Wardell*, 227 N. Y. 1, in which it was held that a secondary boycott was legal; and note *National Protective Association* v. *Cumming*, 170 N. Y. 315, which held that a strike to unionize a shop was legal.

After visiting two shops where he saw machinery of the plaintiffs in operation, the master found: "Upon consideration of these views and of the testimony of the witnesses it is a fact that the operation, [of] practically all of the machinery for the manufacture of finish and trim, requires special training and for some machines a good deal of special training and that the ordinary carpenter or mechanic is not fitted to run most of these machines without some special training. In consequence, the operators of the woodworking

mills form a special branch of the trade and the mills are very largely operated by men who make that their regular work. The ordinary house carpenter whose work is in the construction of buildings is not fitted for running machinery and does not as a matter of fact run such machinery, although there are many instances where a carpenter can and does do both outside work and also inside work in the mills."

From these findings and the reasonable inferences to be drawn therefrom, it is plain that there is a distinct line of demarcation between the nature of the work performed by maker of finish or trim and installer of it, and that the latter does not do the work of the former. The master found that the contractors and builders, on the jobs in connection with which a controversy arose with the union, previously had agreed to furnish their employees with union made materials; he has, however, failed to find whether the contractors and builders entered into these agreements voluntarily. Assuming the agreements were entered into voluntarily, it is clear that such an agreement could not affect existing contracts for the purchase of nonunion made material, see *Berry* v. *Donovan, supra; Beekman* v. *Marsters,* 195 Mass. 205; and, if this assumption be correct — otherwise the strike because nonunion materials were purchased would be clearly illegal, *W. A. Snow Iron Works, Inc.* v. *Chadwick, supra; Burnham* v. *Dowd, supra* — then the question is presented, whether a strike or threat to strike is justified because of their failure to live up to the agreement so made. The facts in the cases at bar are distinguishable from those of *Hoban* v. *Dempsey, supra,* and *Ryan* v. *Hayes, supra,* the analogy presented by which the defendants contend is controlling. Obviously, speaking in terms of competition alone, it is of more concern to workers who obtain their livelihood in a particular craft that they all should join a union, than that workers in other lines of endeavor should become unionized.

In the cases at bar, it is to be noted that the strike affected not only the strikers and their employers, but the plaintiff employers and their workers as well — a circumstance considered of material importance by the court in *Burnham* v. *Dowd,*

*supra* — while in *Ryan* v. *Hayes*, and similar cases, in addition to the employers and striking workers immediately concerned, the strike affected only the nonunion employees.

Although the master made no specific finding — whether agreements were entered into voluntarily or otherwise — such strikes would not be justified even if it be assumed that they were entered into voluntarily; the rights to which the plaintiffs were entitled under the decisions previously cited, could not thereby be destroyed.

The report of the master points to no occasion wherein the workers refused to install nonunion made trim for a builder or contractor who had not entered into an agreement with the union. But in the light of § 59 of the constitution of the Brotherhood, the votes of its members, and the master's finding that they declined to set any nonunion trim, the inference is warranted that the workers had agreed to strike on any job — irrespective of whether or not the contractor had entered into such an agreement — and were ready to carry out their intention.

The master also found that "in accordance with the rules of the Carpenters' District Council the secretary did issue to local unions from time to time lists of the so called unfair mills"; that "the defendant District Council and also the defendant United Brotherhood . . . from time to time printed directories of what were known as 'fair mills' giving the names of mills in each locality, which had entered into the agreement with the Union to unionize the mills and to use the Union labels. These printed lists were issued and distributed generally to the contractors, builders and architects, and manufacturers of finish were solicited to put their names into what was called by the Union 'a friendly business directory.' There was presented to me a 'Fair List' issued by the District Council; none of the plaintiffs appeared in this except Carder Woodworking Company and Davenport-Brown Company. This list was undated. The national list dated February 1, 1916, contained of the present plaintiffs only the name of Carder Woodworking Company, but a national list issued January 1917, contained some of the original plaintiffs who have now withdrawn from this case."

The placing of the plaintiffs' name on an unfair list and circulating it in the manner described in the record was unlawful. *Reynolds* v. *Davis*, 198 Mass. 294, 300. *Cornellier* v. *Haverhill Shoe Manufacturers' Association, supra,* page 559. *Gompers* v. *Bucks Stove & Range Co.* 221 U. S. 418, 437. *Lawlor* v. *Loewe, supra. Auburn Draying Co.* v. *Wardell, supra. Wilson* v. *Hey,* 232 Ill. 389.

In reference to the use of the union label, the master found that the agreement to which the defendants sought to have the plaintiffs become parties, and which various employers had signed, provided that the union label would be placed on all union made materials. Section 59 of the constitution of the United Brotherhood makes elaborate provision for the use of an official label. The defendant union, as a part of its plan to see that nonunion trim should not be set by union carpenters, and to make it easier for them to distinguish between union and nonunion trim, attempted to have the mills use the so called Union label which, for a time, but with little success, was used but was finally abandoned. The same reasoning that applies to the use of the black list applies to the use of the union label. Inasmuch as the use of the label has been abandoned no injunctive relief is necessary and in the absence of a finding of actual damage the plaintiffs are entitled to nominal damages only. *Godin* v. *Niebuhr, supra,* page 353.

The report of the master shows that "in no instance complained of have the defendants . . . caused a sympathetic strike, by other craft to induce the contractor to comply with its conditions as to securing the unionizing of the plaintiff's mill. . . . Upon all the evidence it appears and I find as a fact that there was no agreement between the Carpenters' District Council of Boston and vicinity and other unions within the same district covering the various and numerous trades connected with the erection of buildings, such as masons, steam fitters, electricians and others, whereby it was understood that the members of said different unions of other and different trades would, upon request of the proper authority of said District Council and United Brotherhood, order a strike of any of their members upon

any building where carpenters are employed who are not members of the United Brotherhood of Carpenters and Joiners of America, or upon any building when builders' finish made by the plaintiff is used or about to be used."

The plaintiffs offered evidence tending to show that there was an existing understanding between the defendants and other building trades in Boston as to calling sympathetic strikes. To the exclusion of this evidence the plaintiffs in the Casson case excepted (the plaintiffs' seventh exception); in the Stearns case an exception (the plaintiffs' sixth) was saved to the failure of the master to include in his report his exclusion of this evidence and, in addition, that plaintiff offered as a basis for its motion to recommit, the master's failure to report this excluded evidence. Although the practice was not strictly proper, in view of the wording of the reference to the master, the motion should have been granted. *Cook* v. *Scheffreen,* 215 Mass. 444, 447, 448. The plaintiffs contend that the evidence was offered through a witness Edward N. Kelley in support of paragraph 12 of the Stearns bill and paragraph 10 of the Casson bill. Inasmuch as the evidence offered in either case, so far as applicable, is to be considered as offered in both, we will assume that the master has properly reported it. The evidence was improperly excluded. The understanding between the defendants as to sympathetic strikes could be found to have been a part of the unlawful scheme in which it was alleged the defendants were engaged. *Commonwealth* v. *Knight,* 257 Mass. 421.

The master found that "The plaintiff Carder Woodworking Company has a mill in Boston. . . . The defendants . . . called in the treasurer . . . and asked what he was going to do on the first of June, adding 'of course you understand that you cannot run your business unless we say so,' Howlett remarking, 'I hold my hand on the heads of one hundred and fifty thousand men.' They also said that they could stop all outside finish coming into Boston. That this company refused to sign the agreement and as a result their men who were members of the union attempted to start work as stated by the union, that the company stated to the men that they could not start at that time but must come

earlier, and as a result the men left." He also found that "Defendant Howlett had a talk with Temple [of McKenzie and Temple] . . . and told him that the union men would not put up finish which was not made by members of the United Brotherhood," after which work stopped. Howlett also told Temple that "they had not called in any of their brother tradesmen to assist them in the strike, but they would be compelled to do that if they did not comply with their demands." See *Haverhill Strand Theatre, Inc.* v. *Gillen, supra.*

The sympathetic strike is held to be illegal generally. *Reynolds* v. *Davis, supra. Duplex Printing Press Co.* v. *Deering, supra,* pages 461, 473, 474.

The master further found that the defendant Thulin "called on the plaintiff Davenport-Brown Company and informed Mr. Brown that if he did not make three of the foremen join the union before noontime that day, he would strike the entire shop. On his refusal, between forty-five and fifty men struck and were out a week or ten days. . . . Later this plaintiff gave the defendants Howlett and Feeley $150 for the dues of the three foremen and the men came back to work. Toomey also insisted that one man who did not strike should be fined and this plaintiff should pay the fine and that it should sign the agreement annexed to the bill before he would permit the men to return to work." He also found that representatives of the Brotherhood called upon Burnham Brothers, one of the plaintiffs, and "demanded that they adopt the union label as there would be no finish put up in Boston that did not bear that label, . . . The label would be granted them if they accepted the new demands as to wages, hours and union foremen. . . . the carpenters who were members of the United Brotherhood declined to set trim made in any shop or mill where the trim was not made by members of the United Brotherhood and this included the shop of the plaintiffs."

A strike to compel the employment of union foremen is illegal. *DeMinico* v. *Craig,* 207 Mass. 593. *W. A. Snow Iron Works, Inc.* v. *Chadwick, supra,* page 388. *Fairbanks* v. *McDonald,* 219 Mass. 291. *Haverhill Strand Theatre, Inc.*

*v. Gillen, supra. Mechanics Foundry & Machine Co.* v. *Lynch, supra.* Such strikes, in view of the master's findings quoted, were part of the general plan adopted by the defendants to enforce their demands.

The master found that every candidate when he joins the union "must take oath to abide by the constitution and by-laws. 'He must acquiesce in the will of the majority, observe the local trade rules of this Order, and use every honorable means to procure employment for brother members,' and also 'you pledge yourself to be obedient to authority.'" This constitution provides that "No member of this United Brotherhood shall be allowed to violate the trade rules of the locality in which he works. . . . Any violation of the preceding section shall be punishable by a fine of not more than $5.00 or by expulsion, or by both. . . . Any officer or member . . . who violates the trade rules of the locality in which he is working shall be fined, suspended or expelled, as the local union may decide. . . . Any member who acts in violation of his obligations or violates any section of the constitution and by-laws of the United Brotherhood shall be fined, suspended or expelled at the discretion of the local union, except where the punishment is specified in the laws."

The constitution and by-laws of the Carpenters' District Council of Boston and Vicinity provide, in part, that it shall have the power "To order all strikes when it is for the best interest of the organization, or may delegate such power to its business agent or such persons as the Council may from time to time decide. . . . Its mandates must be observed and obeyed at all times. . . . Any member entering employment of any firm or employer who has been placed nonunion by the Council . . . shall be fined not less than $10.00 . . . No member . . . shall work with any non-union man more than two days without reporting the same to the Council or Business Agent or to his local union . . . penalty not less than $1.00."

It appears from the master's report that the defendant Toomey "produced and it was introduced in evidence a list of fines imposed during the years 1913 to 1917, covering some

three pages of foolscap, fines ranging from $12 to $25, a number of them being placed upon members of the unions No. 1410 and No. 1824, sometimes called Millmen's Union . . . in every instance the action of the union carpenters in refusing to work because of said [nonunion] trim was voluntary." But the constitution and by-laws quoted indicate an intention on the part of the union to enforce its rules concerning nonunion materials by the imposition of fines if necessary. It is well settled that the union cannot compel its members to join an unlawful strike by the imposition of fines. *Carew* v. *Rutherford,* 106 Mass. 1. *March* v. *Bricklayers & Plasterers Union,* 79 Conn. 7. While there is no evidence that the payment of fines by the employers of the men who refused to strike was part of the agreement among the defendants, the fact that the plaintiff, Davenport-Brown Company, was compelled to pay a fine to the union, even if wrongful, is not ground for relief under the frame of the bill. *Boothby* v. *Dezotell,* 256 Mass. 250. *W. A. Snow Iron Works, Inc.* v. *Chadwick, supra,* page 400.

The interlocutory decrees overruling the demurrers are affirmed.

The plaintiffs severally are entitled to a decree dealing with the following issues: (1) The refusal of the members of the union to install nonunion made material; (2) strikes to compel any employers to refrain from purchasing nonunion made material; (3) the issuing of an unfair list; (4) strikes to compel the hiring of union foremen only; (5) the imposition of fines upon union men who are unwilling to join unlawful strikes; and (6) the combination to induce employers to sign agreement "A" or to agree to purchase union made material only.

The defendants have waived their exceptions to the master's report. The exceptions of the plaintiffs, however, not already dealt with will now be discussed.

The court rightly overruled the third exception in the Stearns case and the fourth exception in the Casson case, taken to the exclusion of the evidence of John V. Peard as to his conversation over the telephone with the union headquarters. The evidence was offered to bind the defendants

as representatives of the union. Under the circumstances here existing, this conversation could have no binding effect because the identity of the person with whom Peard talked is unknown. The rule contended for by the plaintiffs, Wigmore, Evidence, (2d ed.) § 2155 (c), is not applicable as it does not appear that Peard called the union headquarters. *Commonwealth* v. *Gettigan*, 252 Mass. 450, 461. *Massachusetts Northeastern Street Railway* v. *Plum Island Beach Co.* 255 Mass. 104, 114.

Exceptions were also taken in each case to the failure of the master to make findings in support of the allegations of paragraph 10 as amended of the Stearns bill and paragraph 8 as amended of the Casson bill, to the effect that "all the defendants, including the national organization, are working together in the same combination and conspiracy to injure the plaintiff." It is contended that "a large amount of evidence in the form of depositions from witnesses in New Jersey, New York and the headquarters of the national organization in Indianapolis, Indiana, having been presented to the master in support of said paragraph," his refusal to make such findings is a reason why the report should be recommitted. The order of reference stipulated, that the cause be referred to the master "to hear the parties and their evidence and report his findings to the court together with such facts and questions of law as either party may request." *Cook.* v. *Scheffreen*, 215 Mass. 444, 447, 448. But, the request not having been made before the parties were informed of the contents of the draft report, these exceptions must be overruled. *Tuttle* v. *Corey*, 245 Mass. 196, 203, 204. *Daniels* v. *Daniels*, 240 Mass. 380, 384.

Upon the question of damages, the master found, that "if upon the facts as found, the court is of opinion that, as matter of law, a conspiracy did exist, I find, that damage in some amount, which I am unable to determine was done to the plaintiffs. I find as a fact, however, that whatever damage the plaintiffs may have sustained . . . was that suffered by others in the same line of business as the plaintiffs, and that they suffered no special damage whatsoever."

On the record the plaintiffs are entitled to nominal damages only. *Godin* v. *Niebuhr, supra,* page 353.

The result is, that the interlocutory decree overruling the exceptions to and confirming the master's report is reversed as to the plaintiff's sixth exception relating to the exclusion of Kelley's testimony, but in all other respects it is affirmed and the cases are remanded to the Superior Court for further proceedings not inconsistent with this opinion.

*Ordered accordingly.*