JETTON-DEKLE LUMBER COMPANY, A CORPORATION, AP-PELLANT, v. GEORGE MATHER, *et al.*, APPELLEES.

1. A modification of a blanket injunction against striking members of a labor union that permits the union peaceably to enforce its rules against its members to the extent of expulsion of such as work as for those employing non-union labor will not be disturbed on appeal.

2. To constitute a conspiracy either the act conspired or the manner of its doing must be unlawful.

3. Where a statute creating a crime is of doubtful interpretation, it should be left to the criminal court primarily for construction, before being applied by the chancery courts as the basis for injunction.

4. A criminal statute denouncing a wrongful conspiracy to prevent persons from obtaining work or to procure their discharge will not be applied to the case of union laborers who strike in order to secure all the labor for themselves.

5. The common law and early statutes of England as to conspiracies among laborers are not so consonant with the spirit of our government as to control us in the grant or the refusal to grant injunctions against laborers who refuse to work.

This case was decided by Division A.

Appeal from the Circuit Court for Hillsborough County.

The facts in the case are stated in the opinion of the Court.

*John P. Wall* and *Macfarlane & Glen,* for Appellant.

*E. R. Gunby,* for Appellees.

COCKRELL, J.: A bill of complaint was filed in the circuit court for Hillsborough county by the Jetton-Dekle Lumber Company, a corporation, for an injunction against various officers and members of the Building Trades Council, a voluntary organization of representatives of organized labor, Carpenters Union No. 696 of the United Brotherhood of Carpenters and Joiners, the Bricklayers, Masons and Plasterers Union No. 3, Painters Union No. 88, Sheet Metal Workers Union No. 88, Electricians Union No. 108, Plumbers Union No. 111, and the Central Trades Labor Assembly.

The bill alleges in substance that the complainant is a general contractor and large employer of labor; that in performance of building contracts it had been accustomed to sublet the painting contracts; that it had on hand various contracts in which the painting has been so sublet and that it was incumbent upon it to complete the contracts under heavy penalties; that a strike of the Painters Union against the painting contractors was declared February 25, 1906, and had ever since remained in effect; that owing to such strike it became necessary to secure non-union painters, and a general strike resulted.

In view of the modification of the injunction, which modification alone is before us for review, but one paragraph of the bill need be quoted.

"16th. And your orator further alleges that the said conspiring labor unions and the said Building Trades Council have further conspired and confederated together

for the purpose of preventing any persons but members of the said labor unions from obtaining work or employment in the city of Tampa in the various departments of labor to which members of the said unions belong, respectively, and to enforce the object of such conspiracy by threatening to boycott and by boycotting all employers employing other than union laborers belonging to the said respective labor unions, and your orator further alleges that each of the said conspiring labor unions has adopted rules forbidding its members from working for any employer who shall employ non-union labor, and that the said rules have been so adopted and contrived for the purpose and with the design and intention, and in pursuance of a conspiracy on the part of the said labor unions, to prohibit the employment of any laborers in the city of Tampa except members of the said unions, and with the purpose, design and intention of securing the entire field for the labor in the city of Tampa to members of the said respective unions, and excluding all other persons therefrom, and that the said rules, so made in pursuance of the said conspiracy, have been heretofore and are now enforced and carried out by the said conspiring labor unions, and the enforcement and carrying out thereof is one of the main objects to which the efforts of the said conspiring labor unions have been heretofore, and are now, directed, and members of the said and other affiliated labor unions in the various departments of labor are bound to comply with the said rules under penalties therein prescribed, and a continued failure to comply therewith on the part of such members renders them liable to expulsion, and to be considered and treated as non-union workmen."

The injunction prayed for was granted without notice.

Thereupon the defendants answered and asked that the injunction be dissolved.

The answer denies all cast of violence, threats or intimidation, but avers that the agreement which had existed between the painters union and the master painters wherein the daily wage was fixed at $3.28 a day if the work was done for the master painters and $3.78 a day if done for others, was repudiated and annulled by the national association, and that the master painters would enter into no further agreement satisfactory to the union painters, and employed non-union painters, "whereupon the members of the painters' union refused to work on any job or contract on which non-union painters were employed, as they have a legal right to do, and notified, as under their rules and regulations they had a right to do, other unions of their action, and the defendants say that it is a rule of their unions that they and their members will not work in shops or on contracts in which or on which laborers are employed who do not belong to the unions, and they, through their officers, have so notified the complainant;" further, that they will not use materials furnished by one who employs non-union laborers; the carpenters and other union workmen who were bound by similar rules also went out on strike.

Upon the hearing for dissolution upon bill, answer and affidavits, the following provisional order was entered: "It is ordered and decreed that the temporary injunction issued herein on May 5th, ult., be modified as follows: That the said defendants and each of them, their members, officers, agents, and representatives, and each and every of them be, and they are hereby restrained and enjoined,

1st.  From using any means, methods or devices what-

ever to intimidate or to prevent by any kind of threats, violence or coercion any person or persons, whether members of any labor union or not, from accepting employment from the complainant in any capacity.

2nd. From using any means, methods or devices to prevent the complainant from employing any person or persons whomsoever, whether members of any labor union or not, and from interfering with any employee of the complainant while in its employment, and

3rd. From boycotting or attempting to boycott the complainant's business, by using any means, method or device to prevent any person, firm or corporation from selling to or purchasing from the complainant any building material or other article of value. Provided, that nothing herein contained is intended to interfere with the several defendants as unions or societies in imposing upon their own members such pains and penalties as may be prescribed by their respective constitutions, by-laws, rules or regulations, in such case made and provided.

It is further ordered that this restraining order shall remain in force until the further decree of the court in the premises."

From the modification contained in the proviso the complainant appeals, assigning as error this proviso, the defendants assign no cross errors and are not complaining here.

Fortunately there have been few differences in this section of this country between labor and capital, and this is the first case that has reached this court. Other parts of the Union have not escaped, however, and other courts have for the past two decades been forced to wrestle with the grave problems involved, not always with unanimity, however, and many of the great questions are

still open; moreover, may it not be judicial to add that as the questions trench so close upon the political, they may finally be solved only by the political departments of the government?

Fortunately again, we may add the question presented on this record is comparatively a narrow one and we shall endeavor to keep it within its narrow confines.

In a large majority, practically all the cases we have examined, we find complications arising from boycotts, picketing, intimidations or even violence. The instant case, as we apprehend it, is one involving the strike only.

Unquestionably, an individual can stop work at any time without cause, being liable only for a breach of contract, and no element of contract as between the complainant and these defendants is alleged. Does the fact that more than one individual has quit work make a difference under the circumstances above stated? We may assume that it is not universally true that many may do what one may lawfully do, though this must be said with reservation, and that a "conspiracy" may cause a wrong which one man acting by himself could not commit. But before the courts can punish or prevent a conspiracy, either the act conspired or the manner of its doing must be unlawful. Are not both alternatives absent in the case of a simple strike? It is certainly lawful to attempt by negotiation or other peaceable, legitimate ways to get higher pay for one's labor, and if the demand is not met to go elsewhere with one's labor or to sit idle if needs be until satisfactory arrangements are made. Labor unions in and of themselves cannot be said to be unlawful, and yet one of the prime objects of their existence is by combinations of the supply to regulate the demand. Some of the cases, particularly the English cases, stress the motive underly-

ing the strike and apparently hold that if the strike is to better the condition of the workman it is lawful, but if it be to punish the employer it is unlawful. If this be the correct delimitation this case comes up to the rule; there is nothing personal to the complainant in the strike, but simply and entirely an endeavor to obtain advantage for the defendants.

No mandatory injunction is asked and nothing can possibly be done as to those laborers who voluntarily left their work and are voluntarily remaining away; but, says the appellant, these various labor unions under the modification can use moral suasion, moral coercion upon its respective members by fines and threats of expulsion. This was a risk voluntarily assumed by the members entering the unions, and if no longer willing to pay the price—if the advantages derived are not equal to the burdens assumed, each member has a perfect right to withdraw from the union, to seek to get back his former employment and to be protected therein by the injunction still in force.

It can hardly be questioned that the decided weight, if not the universal rule of the modern American cases sustains the action of the circuit court in refusing to extend the effects of the injunction so as to include the peaceable enforcement by labor unions of its reasonable rules. See Karges Furniture Company v. Amalgamated Woodworkers Local Union No. 131, 165 Ind. 421, 75 N. E. Rep. 877; Gray v. Building Trades Council, 91 Minn. 171, 97 N.W. Rep. 633, 63, L. R. A. 753; Longshore Printing Co. v. Howell, 26 Oregon 527, 38 Pac. Rep. 547; Macauley v. Tierney, 19 R. I. 255, 33 Atl. Rep. 1; Jensen v. Cooks' & Waiters' Union of Seattle, 39 Wash. 531, 81 Pac. Rep. 1069; National Protective Ass'n of Steam Fitters & Help-

ers v. Cumming, 170 N. Y. 315, 63 N. E. Rep. 369, S. C. 58 L. R. A. 135; Arthur v. Oakes, 24 U. S. App. 239, S. C. 63 Fed. Rep. 310, S. C. 25 L. R. A. 414. In Cooke on Trade and Labor Combinations, p. 34, n. 1, it is said that the only modern case to hold a strike illegal is Mapstrick v. Ramge, 9 Neb. 390, and that it is clear the Nebraska court did not consider the point.

Is there any declared policy in this state to force us to put ourselves out of alignment with our sister states? Especially must this be clear before we would interfere to lay a heavy hand of injunction where the circuit judge, more familiar than ourselves with the conditions confronting the city of Tampa, has refused to do so.

In Chipley v. Atkinson, 23 Fla. 206, 1 South. Rep. 934, this court held that an action would lie in behalf of a discharged employee against one who *maliciously* procured his discharge, and stress is laid upon the evil intent with which the act was done. That case, so far as it is in point, would tend rather to sustain the modification of the injunction before us. Not only was it there held that the mere attempt to procure a discharge would not be actionable, even though the attempt were accompanied with a malicious intent, but it was clearly intimated that even as to the consummated act, malice was essential to a cause of action, and as we have said above, a peaceful strike, accompanied by an enforcement of the rules of a voluntary organization to the extent of expulsion against those members who disobey the rules, does not necessarily show malice.

Chapter 4144, laws of 1893, entitled "An Act to Prohibit Wrongful Combinations against Workmen, and to Punish the Same," presents some difficulty. As this statute is probably unique, we quote at length:

"Section 1. If two or more persons shall agree, conspire, combine, or confederate together for the purpose of preventing any person or persons from procuring work in any firm or corporation, or to cause the discharge of any person or persons from work in such firm or corporation, or if any person or persons shall verbally or by a written or printed communication, threaten any injury to the life, property or business of any person, for the purpose of procuring the discharge of any workman in any firm or corporation, or to prevent any person or persons from procuring work in such firm or corporation, such person or persons so combining shall be deemed guilty of a misdemeanor and upon conviction [thereof] shall be punished by fine not exceeding five hundred dollars each, or by imprisonment not exceeding one year."

Construing the act with reference to its restrictive title, it appears that only *wrongful* combinations against workmen are denounced, and that the combination must have for its main object or purpose the preventing of a certain person or persons from obtaining work or causing their discharge. An indictment based upon the act would have to allege the combination to have been for the purpose of preventing certain named persons from securing work with some firm or corporation or causing their discharge. (For some strange reason, if the employer be an individual, nòt a firm or corporation, the statute does not purport to denounce the wrongful combination.) This legislation, coming after the decision in Chipley v. Atkinson, *supra*, should be read in the light of that decision, and so read it seems to us that it does not come up to the facts before us. Upon the facts before the circuit judge he might well have found that the purpose of the combi-

62—SC

nation was not to prevent particular individuals obtaining work, but the purpose was to secure the work for themselves. It is not the duty of courts of equity to decide upon nice questions of criminal law, and, resolving them against the defendants, impose its injunction against the commission of the acts out of which such nice questions arise. If a combination of workmen, for their own benefit, operates an injury to the property of others and that combination is clearly against the criminal laws of the state, a court of equity may intervene to protect the property right, even though the criminal courts may also be resorted to for enforcing the penalties imposed. Such seems to be the current holding of the courts in this country. Yet where there is serious doubt as to the facts alleged constituting a crime, it would seem best to leave the solution of the doubt to the forum appointed by the constitution directly and specifically for the trial of criminal causes.

We see no special applicability of either section 2405 or 2420 of the Revised Statutes of 1892 to the case here made. Nor does the fact that the common law of England in regard to crimes is by statute in force in Florida necessarily control us now. The English law as to indictable conspiracy against workmen is so interwoven with harsh statutes passed in behalf of those in power that are wholly inconsistent with our ideas of freedom of contract, of life, liberty and the pursuit of happiness, as not to be applied in its rigor in this country. Mr. Bishop says it is an indictable conspiracy for workmen to agree to quit work in a body, aside from any contemplation of lawful means, 2 Bish. New Cr. Law, section 233, but the cases he cites in support of the proposition were cases where vio-

lence actually existed and was alleged. We are inclined rather to agree with the New York court in saying, after considerable reading of the old books, that criminal conspiracy at the common law leaves much to be desired in the way of certainty. People v. Fisher, 14 Wend. 9.

We regret that we are unable to throw light upon this much vexed live question of the hour. Following the correct principle and the weight of the modern American cases in so far as we are able to ascertain the principle and the weight, we find no error in the modification of the injunction, and therefore it is affirmed.

SHACKLEFORD, C. J., and WHITFIELD, J., concur;

TAYLOR, HOCKER AND PARKHILL, JJ., concur in the opinion.