SEBRING, Justice.
The Plaza Theatre property in Miami Beach, Florida, is owned by, Wompearce, Inc., and leased by Biscayne Beach Theatre, Inc. When this suit was instituted in October, 1953, the premises had been subleased by Biscayne Beach Theatre, Inc., to one Danny Brown who proposed to use it for entertainment purposes for the winter season of 1953-54. For several seasons prior to the lease of the premises to Brown, the theatre had been leased to other persons for the same purpose. These lessees had employed orchestras composed of union musicians furnished through Miami Federation of Musicians, Local Union No. 655, and in each instance had defaulted in their contracts and left the musicians stranded without definite employment. As the result of these unfortunate experiences the union musicians, acting through their local union, placed the Plaza Theatre premises upon what is known in union circles as a “defaulter’s list,” which, according to the record, is, in effect, a private credit rating list circulated only among union musicians advising them of various defaults of lessees at various premises and informing them that the local union, as their bargaining agent, will not enter into contracts for performance, either at the premises or with such defaulting persons, until claims under former union contracts have been paid.
Brown entered into his sublease with Biscayne Beach Theatre, Inc., on September 16, 1953. The following day he wrote *300 to the officials of the Miami Local Union requesting that themnion submit a contract binding an orchestra of six musicians to play for him at Plaza Theatre _ for the winter season of 1953-54. The union officials, in response to this letter, advised the lessee that the theatre had been placed on the defaulter’s list because prior sub-lessees had defaulted in the performance of contracts, and that no contract requiring union musicians to perform on the premises would be accepted until the claims had been paid and the establishment thus removed from the defaulter’s list.
Upon receipt of the letter from the union representative, the appellees brought this suit against the local union and its officials, praying that the defendants in the suit be enjoined from placing or keeping the Plaza Theatre on the defaulter’s list, and from refusing to permit or allow members of the union to perform at the theatre; and that a money judgment for damages be entered against the defendants for the damages that the plaintiffs had sustained, and will sustain, on account of the refusal of the union to enter into contract with the lessee, Brown, binding certain of its members to perform for him during the winter season 1953-54.
In due course the defendants answered setting up the facts which have been stated above. In addition, they alleged that not only had the Plaza Theatre been placed on the defaulter’s list of the local union as a bad credit risk,, but also that the lessee Brown was , on- the defaulter’s list of the American Federation of Musicians (a list over which the local union had no control) as the result of the action of the national headquarters for failure to pay a claim prosecuted by the national organization. They alleged further, as the reason for placing the Plaza Theatre on the defaulter’s list, that the theatre had long been known in the vernacular of the trade as a “white elephant;” that “said premises has from time to time been leased to other entrepreneurs including but not limited to productions of Jewish Skits and ‘Min-skey’s’ Burlesque. * * * That none of these entrepreneurs have been able to successfully engage in their operations in the theatre owned by plaintiff lessor;” that the local union and its, members “have been importuned under each [prior] lease to make special concessions for the plaintiff lessors’ ‘white elephant’;” that concessions have been made up to and through the lease of the sublessee who operated the establishment before Brown subleased the premises, resulting in a defaulted contract to the great prejudice of the members of the defendant union who found themselves out of employment, upon the happening of such defaults, for the productive season of 1952-53 on Miami Beach, Florida, and were thereby forced to resort to “single engagements” and other occupations in order to feed themselves and their families; that in view of these past experiences the local union and its members do not care to enter into contracts either with Brown, or with other sublessees, at the premises — at least until the defaulted claims had been paid and the sublessee and the premises havé been removed from the “defaulter’s list.” Finally, they alleged that Brown was fully advised by the union, prior to the time he entered in to lease with Biscayne Beach Theatre, Inc., that the union would not contract with him to furnish musicians for the season until the defaults were cured, and informed him of the reasons for its decision; that consequently he cannot claim damages from the union for losses incurred by reason of his failure to hire union musicians.
After evidence had been submitted on the issues the trial court entered a decree in which it found that if anyone was in default to the defendant union or its members for the payment of musicians’ salaries it was not the plaintiff but was a prior sublessee of Biscayne Beach Theatre, Inc., the holder of the lease from the fee simple owner of the property; that because of the default by the prior sublessee, “the defendants are attempting to black list a valuable building because the owners and lessees thereof refuse to pay a claim which is not owed by them; that if a labor union had the right to black list a building because a tenant therein becomes insolvent *301 or bankrupt and is unable to pay his help, many theatres, hotels, department stores and other buildings would be permanently closed and kept out of channels of commerce; that the aforementioned conduct of the defendant Union amounts, in effect, to an unlawful secondary boycott and to unlawful coercion, unlawful intimidation, unlawful interference with the free use of property, and an unlawful attempted exaction of money for no consideration and where no services are rendered in exchange therefor. * * * That * * * it would be inequitable and unconscionable to permit the defendants to boycott and keep the Plaza Theatre on a black list on account of some alleged act or omission which was attributable to someone having no interest in said Theatre and not to the present owners or lessees 6f the Theatre. * * *»
Based upon these findings the trial court decreed “that the defendants * * * and each of them, be and they are hereby permanently restrained and enjoined from placing or keeping the Plaza Theatre, at Miami Beach, Florida, on the Defaulter’s List of the American Federation of Musicians; [and] that the defendants, and each of them, be and they are hereby permanently restrained and enjoined from refusing to permit or allow members of Miami Federation of Musicians Local Union No. 655 American Federation of Musicians to work at said Plaza Theatre.”
We think that the real questions presented on the appeal from this decree may be stated as follows: (1) Did the listing on the “defaulter’s list” circulated only within the union organization amount to a secondary boycott in respect to the persons and premises therein listed? (2) Can a voluntary association, such as a local labor union, be enjoined from “refusing to permit or allow members” to work at a particular theatre, when past experiences of the union have demonstrated that entertainment there involves a bad credit risk to the performers?
It is apparent from the pleadings in this cause that the plaintiffs’ claims are not based upon the existence or cessation of contractual relations with the union or its members, and there is, of course, no attempt to compel the performance of services by member musicians or to force outright the execution of a contract by the union as bargaining agent for its members. See Henderson v. Coleman, 150 Fla. 185, 7 So. 2d 117.
The defaulter’s list involved in this case was intended for circulation only among union members, apparently implemented by a rule, in effect, that any member rendering service to such parties would risk imposition of penalty by the union. The injunc-tive relief sought and granted herein was apparently intended to force the union to withdraw or nullify the restrictive effect of the defaulter’s list which allegedly operated to prevent its members from entering employment in the theatre in question, and at the same time remaining in good standing' with" their union. It would seem, therefore, that the ultimate objective of the pending proceeding is simply to obtain assurance, by court injunction, that any members who can be persuaded by the lessee to work in the Plaza Theatre may do so without the threat of penalties that may be imposed by the union upon such members as a deterrent to the acceptance of such employment.
In at least two previous instances this Court has held that the injunctive process is not available to prevent, directly, a union’s enforcement of its own rules and regulations by disciplinary action against members where np act of violence, intimidation, illegal picketing, or boycott is involved. The case of Jetton-Dekle Lumber Co. v. Mather, 53 Fla. 969, 43 So. 590, is a case on point. There an injunction was sought to prevent a local union from enforcing a rule forbidding members from, working for an employer who used nonunion labor. The order appealed from contained an express provision, which was upheld on appeal, that “nothing herein contained [shall] interfere with the several defendants, as unions or societies, in imposing upon their own members such pains and penalties as *302 may be prescribed by their respective constitutions, by-laws, rules or regulations in such case made and provided.” In Harper v. Hoecherl, 153 Fla. 29, 14 So.2d 179, 180, a case brought by an outsider to restrain a local union from disciplining members for rule infractions, it was said: “The great weight, if not the universal rule, of the authorities is to the effect that ordinarily courts will not interfere to settle differences between a labor union * * * and its members. * * * Membership in such organization being non-compulsory * * * courts have generally left the settlement of their internal affairs to the organization, to be conformed to by its members so long as they choose to retain their affiliation with the organization.”
The qualification recognized in the latter case to the effect that if a union rule or regulation were actually invalid or unlawful then relief might be afforded, at the behest of a third party damaged by such rule, would not appear to be operative under the facts of the case at bar. The listing of the theatre’s owner as a defaulter for nonpayment of a lessee’s debts is not in itself unlawful. Viewed in its worst aspect, it amounts to nothing more than an attempt by the union to require the owner to underwrite the debt. Whatever the merits of such a demand, or the court’s opinion of its fairness or wisdom, it cannot be considered inherently illegal, particularly in view of the fact, referred to in the decree, that the parties had never been able to reach a mutually satisfactory agreement in their negotiations with respect to security for future seasonal contracts sufficient to allay the union’s well-supported distrust of the thea-tre in question as a credit risk. Certainly, upon all the evidence, it must be concluded that there existed, from the defendant union’s point of view, a genuine grievance or dispute with the parties currently interested in the theatre; and under the circumstances, the union’s “boycott,” if the simple withholding of services can be considered a boycott (see Paramount Enterprises v. Mitchell, 104 Fla. 407, 140 So. 328, 331; 31 Am. Jur., Labor, Sec. 265, p. 964; Opera on Tour v. Weber, 285 N.Y. 348, 34 N.E.2d 349, 35 N.E.2d 920, 136 A.L.R. 267), would be primary and lawful for the purpose of securing certain demands from the owner or current lessee, and not secondary and unlawful in the sense that pressure is brought against a third party with whom there exists no dispute in order to coerce his support in obtaining favorable settlement of a dispute with another. Teller, Labor Disputes and Collective Bargaining, Vol. 1, p. 455; Truax v. Corrigan, 257 U.S. 312, 42 S.Ct. 124, 66 L.Ed. 254; 31 Am.Jur. 957.
The case at bar appears to be well within the principle recognized in this jurisdiction as controlling union persuasion by a peaceful strike, picket, or boycott — that such a practice is lawful “to the extent that its purposes are within the allowable ambit of legitimate labor activity.” Local Union No. 519 of United Ass’n of Journeymen and Apprentices of Plumbing and Pipefitting Industry of U. S. and Canada v. Robertson, Fla., 44 So.2d 899, 904. In any event, the injunctive order entered below, to the effect that “the defendants * * * are hereby permanently restrained and enjoined from refusing to permit or allow members of * * * Local Union No. 655' * * * to work at said Plaza Thea-tre,” is so broad that it is manifestly improper under the decided cases. Moore v. City Dry Cleaners & Laundry, Fla., 41 So.2d 865; Seaboard Rendering Co. v. Conlon, 152 Fla. 723, 12 So.2d 882.
The decree appealed from should be reversed with directions that a decree be entered in conformance with this opinion.
It is so ordered.
ROBERTS, C. J., and TERRELL and MATHEWS, JJ., concur.