### BOARD OF PUBLIC INSTRUCTION OF DUVAL COUNTY v. NATIONAL ASSOCIATION for the ADVANCEMENT of COLORED PEOPLE, et al.

No. 66-6199.

Circuit Court, Duval County.

April 17, 1967.

Elliott Adams, Jacksonville, for plaintiff.

Earl M. Johnson, Jacksonville, and Robert L. Carter and Joan Franklin, both of New York City, for defendants.

ROGER J. WAYBRIGHT, Circuit Judge.

*Final judgment:* In this action the plaintiff, the Board of Public Instruction of Duval County (hereafter called "school board") sued the National Association for the Advancement of Colored People (hereafter called "NAACP") and 15 natural persons — Wendell P. Holmes, Rutledge Pearson, Sallye Mathis, Lewis J. Carter III, S. L. Badger, Charles B. Dailey, J. C. Downing, J. S. Johnson, R. L. Jones, Hunter H. Satterwhite, Leander J. Shaw, Jr., F. D. Wilson, Earl M. Johnson, Charles B. McIntosh, and Ernest Newman.

At the conclusion of the presentation of evidence on behalf of the plaintiff at the trial, the plaintiff candidly conceded that it had offered no evidence sufficient to maintain an action against any of the natural persons who were defendants except Wendell P. Holmes, Rutledge Pearson, Charles B. Dailey and R. L. Jones. The court at that point granted the defendants' motion for a dismissal of the action as to all of the natural persons who were defendants except those four. Consequently, this is at this point an action by the school board against the NAACP and Wendell P. Holmes, Rutledge Pearson, Charles B. Dailey and R. L. Jones.

The school board complained, in essence, that the NAACP and those four natural persons had proclaimed and caused three different boycotts of the public schools by children of the Negro ethnic group on December 7-9, 1964, on March 8-9, 1966, and on October 24, 1966. As a result, the school board charged, 7,000 to 19,716 school children of that group were absent from school on those dates, costing the school board $3.33 per day per absent child in state aid. The school board asked that the NAACP and those four natural persons be enjoined from calling any more such boycotts, and be required to pay the school board the money lost by the last two of the three boycotts.

The NAACP and the four natural persons denied that they caused any boycott, claimed that the school board in actuality lost no money as a result of the boycotts, and contended they had an absolute and unrestricted right to cause such boycotts under the freedom of speech clause of the federal constitution.

The action was tried before the court, without a jury, on April 12-14, 1967.

The findings and conclusions drawn by the court from the evidence are stated hereafter.

Various members of the Negro ethnic group became discontented because they conceived that the school board was not proceeding fast enough to desegregate the Duval County public schools. Using labels such as "Jacksonville Branch NAACP", "Citizens Committee for Better Education in Duval County", and "Interdenominational Ministerial Alliance", they embarked on a "direct action program." With Wendell P. Holmes as their chief spokesman, with Rutledge Pearson chiming in from time to time, and with Charles B. Dailey and R. L. Jones silently flanking Wendell P. Holmes on one of his television appearances, they issued handbills and statements to the press and over television sounding the tocsin for public school children to stay away from school on the dates mentioned, to "dramatize" their protest.

From the standpoint of accomplishing their immediate purpose, they were successful — newspaper reports quoted school officials as saying that 17,000, 10,000, and 7,000 Negro students stayed away from school December 7-9, 1964. An average 13,534 of the 24,434 children enrolled in all-Negro schools were absent March 7-8, 1966. And an average 15,460 of the 26,792 children enrolled in all-Negro schools were absent October 24-25, 1966.

This court cannot be naive enough to shut its eyes to the cause-and-effect sequence. The contention of the defendants that their "direct action program" did not cause the boycotts is rejected. The court finds to the contrary.

That Wendell P. Holmes was the prime mover was proved beyond cavil. That Rutledge Pearson was almost equally as prominent is quite evident. Charles B. Dailey and R. L. Jones, while silent, did not just happen to be in the vicinity when the television camera turned their way, but deliberately accompanied Wendell P. Holmes on a special trip to the television station and sat on each side of him in front of the camera while he delivered his prepared speech, lending their approving presence and moral support to him for all the community to see. If credit-claiming for the success of the direct action program was the order of the day instead of disclaiming responsibility and invoking the shibboleth "guilt by association", Charles B. Dailey and R. L. Jones would be entitled to boast of feature roles rather than walk-on parts.

The NAACP's participation, or lack of participation, is more difficult to evaluate. The handbills distributed calling for the boycotts were issued in the name of "Jacksonville Branch NAACP", not simply "NAACP". "NAACP" was loosely used in various news stories, sometimes obviously referring only to the local branch and sometimes leaving an inference that the national organization might be involved. In his telegram to the county school superintendent threatening further action if any child absent during the third boycott should be expelled from school or any parent should be proceeded against, Wendell P. Holmes referred to "the current direct action program of the N.A.A.C.P.", said that "the full legal resources of the national office of the N.A.A.C.P. . . . will be utilized", and signed himself "Chairman Education Committee NAACP." When his deposition was taken in this action just a month ago, Rutledge Pearson (local NAACP head for 6 years, state NAACP head for 5 years, southeastern region NAACP head for 1 year, national NAACP board member for 2 years) gave the "NAACP" full honors for involvement and

sponsorship, but at the trial said he meant the local branch of the NAACP. The general counsel of the NAACP and one of his legal staff were attorneys for the defendants at the trial. The NAACP has never repudiated any of the assertions made that it was actively involved, so far as the court was made aware, although as a defendant in this action it has known for at least a month before the trial (since the depositions of Wendell P. Holmes and Rutledge Pearson were taken) of the use of its name by the natural person defendants.

Obviously, any person desiring to bolster his status in calling for a crusade can invoke the name of a national organization, without thereby placing responsibility on the organization. The court is not familiar with the inner workings of the NAACP, and has no idea whether it formally authorized specific programs or loosely, as a matter of sustained policy, cheers on and backs up just about any of its local branches. Either is possible, legally speaking, and the NAACP might very well become responsible for local action without a formal resolution of its national board authorizing the specific action.[1] But in this case the court is not persuaded that the school board has proved, by the greater weight of the evidence, that the NAACP was involved. The complaint would be dismissed, as against that defendant, for that reason alone.

Turning now to a consideration of the case against the four natural person defendants, Wendell P. Holmes, Rutledge Pearson, Charles P. Dailey and R. L. Jones.

Thirteen years have passed since the U. S. Supreme Court decided[2] that "separate but equal" racially segregated public schools deprive persons of the Negro ethnic group of the equal protection of the laws guaranteed by the fourteenth amendment to the federal constitution. A year later that Court directed desegregation to proceed "with all deliberate speed."[3]

The defendants obviously think that locally there has been a great deal more deliberation than speed in accomplishing desegregation of the public schools.

---

1. See N.A.A.C.P. v. Overstreet, 384 U.S. 118, 16 L.ed.2d 409, 86 S.Ct. 1306 (1966), cited by the school board.

2. Brown v. Board of Education of Topeka, 347 U.S. 483, 98 L.ed. 873, 74 S.Ct. 686 (1954).

3. Brown v. Board of Education of Topeka, 349 U.S. 294, 99 L.ed. 1083, 75 S.Ct. 753 (1955).

The local school desegregation story is being written in the federal district court,[4] not in this court. There, in 1962, the school board was enjoined from continuing to operate compulsorily racially segregated schools, and by later orders the school board was directed to desegregate gradually, a grade a year, until all grades through high school were desegregated by 1974. Three months ago, that federal court found that the school board was dragging its feet, and specified certain requirements designed to speed up desegregation past the stage of "tokenism."

The defendants, discontented with the rate of progress of public school desegregation achieved by resort to the federal court, and concluding that the conventional forms of protest by appeals to the school board and county budget commission were getting them nowhere, conceived of school boycotts as a means of dramatizing and calling public attention to their plight.

They tried it once, and it worked. They tried it again, and again it worked. A third time they tried it, and a third time it worked. Worked, that is, in the sense that thousands of Negro children stayed away from school. What else was accomplished is debatable.

Without doubt, the defendants or other Negro leaders will call for still more local school boycotts unless they are restrained from doing so.[5]

The school board wants to put a stop to this particular method of protest, saying school boycotts merely aggravate the problem by decreasing the state money available to solve some of the conditions about which the defendants protest.

The question is whether the school board can properly call on this court to put a stop to school boycotts being stimulated by the four natural person defendants.

The school board started out by basing its case on Florida's compulsory school attendance law.[6] That law requires all school age children "to attend school regularly during the entire school

---

4. Braxton v. The Board of Public Instruction of Duval County, Florida, No. 4598-Civil-J, U.S. District Court for the Middle District of Florida.

5. This court could scarcely avoid learning, from newspaper stories, that a school boycott was in progress during the trial of this action.

6. Florida Statutes §§232.01, 232.09, 232.17(2)(c), 232.19.

term", says that "Each parent of a child within the compulsory attendance age shall be responsible for such child's school attendance", makes the parent punishable for a misdemeanor if he doesn't send his child to school, and makes the child subject to juvenile court action as a truant.

The school board contends that, by calling on parents to keep their children out of school, the defendants are urging the parents and children to violate the law. Therefore, the school board argues, the defendants should be enjoined from such action, and should have to reimburse the school board for the state money already lost during the second and third boycotts.

The rule is generally recognized, in Florida as well as elsewhere, that a court of equity will not restrain the commission of a criminal act nor exercise its power to enforce the criminal laws, but will leave the function of punishing the wrongdoer to a criminal court.[7] For that reason alone, this court could not enjoin the defendants from urging violation of law.

The defendants, arguing that any action taken by the school board should not be against them but against the parents of the children who were absent from school, point to the provisions of Florida's compulsory school attendance law[8] prescribing that "Each parent of a child within the compulsory attendance age shall be responsible for such child's school attendance . . . The absence of a child from school shall be prima facie evidence of a violation of this section . . ." Under the mechanics provided in the statutes, written notice is given to the parent requiring attendance within three days, and if that is ignored the parent can be criminally prosecuted for a misdemeanor and the child can be hailed into juvenile court as a truant.

Obviously, a two or three day boycott would be over before the three-day notice would have to be complied with, even if the school board people could physically get out the thousands of notices involved. And the school board does not, it is assumed,

---

7. Hagerty v. Coleman, 133 Fla. 363, 182 So. 776, 777 (S.C. Fla., 1938); Pompano Horse Club v. State, 93 Fla. 415, 111 So. 801, 809, 52 A.L.R. 51 (S.C. Fla., 1927); Jetton-Dekle Lumber Co. v. Mather, 53 Fla. 969, 43 So. 590, 593 (S.C. Fla., 1907); 9 Fla. Jur., Criminal Law, §99 (1956); 28 Am. Jur., Injunctions, §157 (1959).

8. Florida Statutes §§232.09, 232.17(2)(c), 232.19.

have the thousands of "attendance assistants" (truant officers) who would be needed to carry out the preliminary statutory task of visiting each child's home to investigate by noon of the first day the children who were absent during a boycott, as the defendants suggested during argument.

The defendants urge that a person can never become liable to punishment, to injunction, or to damages for what they choose to call "pure speech" — that is, speech only, unaccompanied by any act or conduct. Thus, they say, they have an absolute right to use speech to encourage or to incite to action, so long as they themselves do not act. Picturesquely, one of them spontaneously and publicly commented from the heart regarding the pending case, upon first learning of it — "This is stupid . . . If I tell a fellow to blow your brains out, am I guilty of murder?"

He might very well be guilty of murder, as a principal or accessory, under certain circumstances. Not always is the man who pulls the trigger the only one responsible.

This problem has been discussed by the U. S. Supreme Court in a number of cases.[9]

Over a half-century ago a man who, in a newspaper, called for a boycott against those opposed to a nudist camp he liked was convicted of violating a law making it illegal to edit printed matter tending to encourage and advocate an actual breach of law, in that instance a state law prohibiting indecent exposure. The U. S. Supreme Court upheld the conviction,[10] holding that it was not an unjustifiable restriction of liberty and did not infringe the constitution. Speaking through Mr. Justice Holmes, the Court said the state statute under which the man was convicted "lays hold of encouragements that, apart from statute, if directed to a particular person's conduct, generally would make him who uttered them guilty of a misdemeanor if not an accomplice or a principal in the crime encouraged, and deals with the publication of them to a wider and less selected audience."

And that decision was cited[11] by the U. S. Supreme Court only two years ago as authority for the proposition that "A man may be punished for encouraging the commission of a crime."

---

9. Annotations at 93 L.ed. 1163, 2 L.ed. 2d 1715, 11 L.ed. 2d 1136.

10. Fox v. Washington, 236 U. S. 273, 277, 59 L.ed. 573, 575, 35 S.Ct. 383 (1915).

11. Cox v. Louisiana, 379 U. S. 559, 563, 13 L.ed. 2d 487, 491, 85 S.Ct. 476 (1965).

Even those most solicitous of the right to freedom of speech consistently concede that "These rights may be abused by using speech . . . in order to incite to . . . crime."[12]

The "assumption that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please" was rejected by a majority of the U. S. Supreme Court last October.[13]

The defendants' frustration with more orthodox methods of protest is understandable. While the right to petition the government for the redress of grievances goes back at least as far as Magna Carta in Anglo-American law, and for the full 5,000 years of recorded history in the mainstream of human culture, "Legislators may turn deaf ears; formal complaints may be routed endlessly through a bureaucratic maze; courts may let the wheels of justice grind very slowly."[14]

But that does not mean that the defendants have an unrestricted constitutional right to use speech to call on other people to commit crimes, whether the crime is blowing out someone's brains or something less lethal.

The defendants say that the statute[15] requiring all school age children "to attend school regularly during the entire school term" is unconstitutional because of the proviso added to it in 1959 "provided, further, however, that any other provisions of this section notwithstanding, no child shall be compelled to attend any school in which the races are commingled when a written objection of the parent or guardian has been filed with the board of public instruction."

The defendants point to a decision of the Supreme Court of Appeals of Virginia[16] reversing a conviction of a Negro parent for violating a compulsory school attendance law. The parent

---

12. DeJonge v. Oregon, 299 U. S. 353, 364, 81 L.ed. 278, 284, 57 S.Ct. 255 (1937), quoted in the minority opinion in Adderley v. Florida, 17 L.ed. 2d 149, 160, 87 S.Ct. 242, 251 (1966).

13. Adderley v. Florida, 17 L.ed. 2d 149, 156, 87 S.Ct. 242 (1966).

14. Adderley v. Florida, 17 L.ed. 2d 149, 158, 87 S.Ct. 242 (1966) [minority opinion].

15. Florida Statutes §232.01.

16. Dobbins v. Commonwealth, 198 Va. 697, 96 S.E.2d 154 (1957).

sought to enroll his child at an all-White high school, and the school board declined to enroll her there but offered to transport her by bus to an inferior all-Negro high school 18 miles away. The father declined the offer, and was convicted of failing to send his child to school. The Virginia court held that, while the compulsory school attendance law was constitutional, as applied to this parent who had sought to have his child attend school it was unconstitutional as a denial of the equal protection of the law and violative of the fourteenth amendment. The court said that "Application of a criminal statute so that it brings about or results in inequality of treatment to the two races is not justified."

The defendants also cite a New York trial court decision[17] that parents of Negro children could not be compelled, under compulsory school attendance laws, to send their children to de facto (not de jure) racially segregated schools of inferior quality, but had "the constitutionally guaranteed right to elect no education for their children rather than to subject them to discriminatorily inferior education."

While those two decisions cited by the defendants are not precisely in point, it is blatantly obvious that the proviso added to Florida's compulsory school attendance law in 1959 makes that law unconstitutional, not only in its application to Negro children but also in its application to White children. It denies equal protection of the laws to any child of school age. A child, Negro or White, who enrolls in a school in which races are not commingled is forced to go to school, but a child who enrolls in a school in which the races are commingled need not. Yet segregation of the races is no longer valid as a basis for classification, and has not been for some years.

It was the evident legislative intent, in adding that specific proviso to the law, that school attendance was not to be compelled unless the races were not commingled. Considering the legislative composition and climate in 1959, it is apparent that the intent of the 1959 legislature would be perverted by separating that proviso from the rest of the statute and striking down only the proviso as unconstitutional.[18] The entire section stands or falls together. And fall it must, for it is unconstitutional as it is written.

---

17. In re Skipwith, 14 Misc.2d 325, 180 N.Y.S.2d 852 (Dom. Rel. Ct. of City of New York; 1958).

18. See 6 Fla. Jur., Constitutional Law, §§96-99 (1956).

The net effect is that school attendance cannot be constitutionally compelled in Florida, unless and until that proviso is removed from the law.[19]

Therefore, staying away from a Florida public school is not a crime, and urging parents to keep their children away from school is not urging the commission of a crime.

With reluctance, and some sorrow, this court reaches that conclusion. No long-term good for the Negro ethnic group can come from keeping their children away from school. Whatever the future holds for Negro children, or for all children, that future can only be more bleak for a child who stays away from a poor school than for a child who gets whatever formal education is available.

The school board, apparently recognizing (but not specifically conceding) the constitutional infirmity of the compulsory school attendance law, came up during the trial with another theory on which to base its contention that an injunction should issue. The school board, it says, is required to "See that adequate education facilities are provided . . . for all children of school age in the county . . ."[20] and "All children who have attained the age of seven years . . . but who have not attained the age of sixteen years . . . are required to attend school regularly during the entire school term . . ."[21] This, contends the school board, constitutes a contractual arrangement between each child who enrolls in school and the school board that the school board will provide the child adequate educational facilities and the child will be there each day to be provided with those facilities. The defendants, argues the school board, are tortiously interfering with that contract, and are liable to the school board in damages under the doctrine that — "Intentional and justifiable [sic] interference with contractual relations is actionable as a tort. A party to a contract has a cause of action against one who has procured breach of the contract by the other party thereto, where such interference is not a legitimate exercise of the rights of the third party."[22]

---

19. The court notes, from newspaper stories, that a bill to do just that has been introduced in the current session of the legislature.

20. Florida Statutes §220.23(4)(c).

21. Florida Statutes §232.01.

22. 32 Fla. Jur., Torts, §12 (1960).

This court cannot quite grasp the fact that, because the law requires the school board to furnish all school-age children an education, and requires all such children to attend school to receive it, that makes a contract between the school board and the children. A contract usually requires two consenting parties, for one thing, and while the school board no doubt eagerly consents there are doubtless at least some children who do not. It is difficult to conceive that any property rights of the school board have been invaded, or any other basis for equating the school board with a businessman whose contract with someone else has unlawfully been interfered with.

In view of the conclusions reached, no useful purpose would be served by discussing the complex problem of whether the school board has in fact lost state aid money because of the boycotts.

Upon consideration, it is adjudged that:

1. The complaint is dismisséd. This action is terminated.